UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                          :
ARTHUR J. GALLAGHER & CO.,                :          CASE NO. 16-CV-00284
                                          :
            Plaintiff,                    :
                                          :
      v.                                  :          OPINION AND ORDER
                                          :
KYLE ANTHONY,                             :
                                          :
            Defendant.                    :
                                          :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

     Plaintiff Arthur J. Gallagher & Co. ("Gallagher") brings breach of contract, tortious interference, and misappropriation of trade secrets claims against Defendant Kyle Anthony ("Anthony"),[1] its former employee. In response, Anthony brings breach of contract counterclaims.[2] Defendant Anthony's counterclaims posit that Gallagher stiffed Anthony on pay.

     This Court held a bench trial on the matter the week of June 27, 2016.[3] The parties subsequently filed amended findings of fact and conclusions of law.[4] For the reasons below, this Court finds that Plaintiff's claims lose and Defendant Anthony's claims win.

## I.    Background

     America's economy depends on property rights, enforceable contracts and free market competition. Because the Plaintiff seeks to reduce competition through a non-solicitation and non-service employment contract, these goals come into tension in this case.

---

[1] Doc. 1.
[2] Doc. 8.
[3] Docs. 78, 79, 80, 84.
[4] Docs. 89, 90.

Plaintiff Arthur J. Gallagher & Co. provides employee benefit brokerage, consulting and administration services, human resource consulting, and commercial insurance products and services.[5]

From late 2010 until November 20, 2015, Defendant Kyle Anthony worked for Gallagher as an Area Vice-President. Anthony's responsibilities included developing, managing, and servicing employee benefits accounts.[6]  In carrying out his employment, Anthony largely worked independently of other Gallagher work groups.

Anthony came to Gallagher after Gallagher purchased insurance agency Behnke & Company, Inc. Anthony worked for Behnke for many years and successfully built client relationships that Anthony brought to Gallagher with the Behnke purchase. Defendant Anthony owned approximately 5% of Behnke and received compensation when Gallagher purchased Behnke.[7]

Anthony became one of Gallagher's top producers. Anthony was also a Gallagher team leader, managing a group of employees who reported directly to Anthony and to Steve Hopp.[8] Anthony and Steve Hopp supervised the Anthony-Hopp sales team. The Anthony-Hopp team largely operated independent of other Gallagher sales employees.

On the Anthony-Hopp team, Tara Zick was senior account manager, and Tracey Jaycox and Kristen Maslowski were account managers.[9] Gallagher Vice-President Mark Alder generally

---

[5] Tr. 60:10-19; 61:8-25.
[6] Tr. 66:9-16.
[7] Gallagher paid Anthony $750,000 over three years.
[8] *See* Tr. 68.
[9] Tr. 68; Pl. Ex. 119.

supervised Anthony. However, the Anthony-Hopp team independently created their own sales

leads and received little Gallagher help in developing or servicing accounts.

Anthony and other Gallagher employees received online and seminar training.[10] Anthony

also had access to Gallagher's client information and business strategy information.[11] Gallagher

spent about $246,000 for the Anthony-Hopp food, airfare, hotels, technology, and staff

expansions.[12]

*The Employment Contract*

In connection with its purchase of the Behnke agency, on November 18, 2010, Anthony

and Gallagher agreed to a thirty-seven month Employment Agreement.[13] On October 6, 2011,

Anthony and Gallagher agreed to a two-page written Addendum to the agreement.[14] The

Addendum clarified Anthony compensation issues that had come up. Anthony's employment

agreement did not include a non-compete provision.[15] If Anthony chose to leave Gallagher, the

employment agreement allowed Anthony to work for Gallagher competitors.

While Anthony's employment contract did not have non-compete provisions, the contract

did have a non-solicitation provision. Section 8-B contained clauses specifying that:

> [f]or a period of two (2) years following the termination of
> [Anthony's] employment with [Gallagher] for any reason
> whatsoever, [Anthony] will not engage in providing insurance
> Services or Benefit Services for: (i) any Account of the Company
> for which Employee performed any of the foregoing functions

---

[10] Tr. 83-87.
[11] Tr. 98.
[12] Tr. 88-91.
[13] Doc. 42 at ¶ 3.
[14] *Id*. at ¶ 4.
[15] *Id*. at ¶ 2.

during any part of the two (2) year period immediately preceding such termination, or (ii) any Prospective Account.[16]

The term "Account of the Company" includes:

all users of Insurance Services and/or Benefit Services including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date [Anthony's] employment with [Gallagher] terminates, or an insurance carrier offering a custom program for which the Company is a managing general agent, managing general underwriter, program manager or an underwriting agent, regardless of how the relationship is documented or characterized.[17]

Section 8-C gives examples of indirect and direct solicitation, including Anthony or his new employer "sending an announcement . . . to any Protected Account or Prospective Account . . . to communicate [Anthony's] departure," "communicat[ing] with any Protected Account or Prospective Account . . . in a way [that] relates to insurance Services and/or Benefit services," and "facilitation [of and] execution of a broker of record letter replacing the Company as its broker of record."[18]

As will be discussed, in this lawsuit, Gallagher claims that the non-solicitation provision stopped Anthony from trying to obtain work from Cuyahoga County. Although Cuyahoga County was not a Gallagher customer, Gallagher argues that it was a "prospective" account. Section 8-F defined "prospective account" as

any entity . . . with respect to whom, at any time during the one year period preceding the termination of Employee's employment with the Company, Employee: (I) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (II) had material contact or acquired Confidential Information as a result of or in connection with Employee's

---

[16] Doc. 1-1 at 19.
[17] *Id.* at 19-20.
[18] *Id.* at 20-21.

employment with the Company, or (III) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee . . .

Section 8-E also restricted Anthony from soliciting or inducing other Gallagher employees to leave Gallagher, both during and for two years after leaving Gallagher.[19]

The employment agreement ran for a 37-month term. Anthony's employment then became at-will.[20] The terms of Anthony's at-will employment provided that:

> [Anthony's] continued employment shall be subject to the terms and conditions of this Agreement, except for those contained in Section 3 [compensation], which shall be subject to renegotiation between the parties but which shall remain in effect until the parties reach mutual agreement on revisions thereto.[21]

As mentioned in this provision, the Employment Agreement said that the agreement would establish compensation during the 37-month term and said that both parties must mutually agree to changes to that compensation. And as described above, Gallagher and Anthony resolved some Employment Agreement uncertainties with an October 2011 Addendum. With the Addendum, the parties agreed that any compensation changes needed mutual agreement and agreed that compensation "shall not be further modified or amended unless such modification or amendment is reduced to a writing signed by the parties."[22]  The parties' agreement that compensation changes required mutual signed agreement becomes important because Anthony claims that in 2015, Gallagher retroactively reduced Anthony's compensation without his signature or consent.

---

[19] Doc. 1-1 at 22.
[20] *Id*. at 2.
[21] *Id*.
[22] Pl. Ex. 1.

Anthony says he did not receive adequate team support. Specifically, Anthony says Gallagher denied Anthony's request for additional staff. Anthony claims that additional staff were needed to maintain adequate customer service which was crucial to retaining clients and important to Anthony's compensation.

Gallagher denied some of Anthony's requests for additional employee support because Anthony's sales success resulted in his receiving high compensation. In effect, Gallagher seems to have taken the position that Gallagher had agreed to an Anthony compensation package that was too generous to Anthony.

In 2013, when Gallagher Area Vice-President Mark Alder agreed with Anthony's request for two additional staff members for the Hopp-Anthony team, Gallagher Chief Financial Officer John Caraher denied the request, stating "we can't afford to pay them when we are paying the producers [Anthony and Hopp] over 40 percent."[23]

In October 2015, Gallagher changed Anthony's compensation. Anthony had agreed to a December 2013 compensation change, but did not agree to the October 2015 alteration. Importantly, Plaintiff Gallagher's October 2015 compensation change was both prospective and retroactive. It proposed changing Anthony's 2014 compensation long after the 2014 incentive compensation had already been reconciled and proposed changing the 2015 pay for 2015 months that had already been worked.

The October 2015 change reduced Anthony's incentive compensation by increasing the target level from $4.6 million to roughly $5.1 million before Anthony would receive a bonus.

---

[23] Def. Ex. 5.

The October 2015 change increased Anthony's fixed compensation but reduced his bonus opportunities unless his total book of business continued expanding.

Gallagher says it reduced Anthony's compensation to fund new support for the Hopp-Anthony team.[24] In 2015, Gallagher approved two additional staff positions for the team.[25] Gallagher claims it proposed retroactively changing Anthony's 2014 compensation long after that compensation was reconciled because it had found a mistake. Gallagher said it would reduce Anthony's 2015 bonus and incentive compensation by the amount of the 2014 adjustment. Gallagher did not fully explain how Anthony's Employment Agreement and Addendum gave Gallagher the right to retroactively apply a changed 2015 compensation formula to the 2015 work that Anthony had already done.

### Anthony Leaves Gallagher for Oswald

After Gallagher gave Anthony notice that it was changing his compensation, on October 30, 2015, Anthony gave Gallagher the required three weeks' notice of his resignation.[26] Anthony gave the notice to his supervisor Vice-President Mark Alder.[27]

Around November 5, 2015, Oswald offered Anthony a job. Oswald Chief Executive Robert Klonk testified that Oswald offered Anthony significant compensation because "he is one of the best there is in the country, and that's why we hired him."[28] Oswald offered Anthony a job but separated Anthony from soliciting or servicing any customers that Anthony had sold or serviced at Gallagher. For example, Klonk testified that Olympic Steel Vice-President and

---

[24] Pl. Exs. 110, 111; Def. Exs. 54, 55.
[25] Tr. 90.
[26] Doc. 42 at ¶ 7.
[27] *Id.* at ¶ 8.
[28] Tr. 194:9-12.

Treasurer Rich Manson called him to express interest in doing business with Oswald. Klonk says he told Manson that Anthony "couldn't work on the account and couldn't have anything to do with the account, and we would honor the [Gallagher non-service] agreement."[29]

After Anthony gave Gallagher notice that he was leaving Gallagher, Gallagher did not restrict Anthony's access to any Gallagher information. For three weeks, Anthony continued to work for Gallagher with full access to all client information and data after he told Gallagher that he was leaving to work for Oswald.[30]

On Anthony's last day, Anthony gave Gallagher the electronic devices that Anthony used while with Gallagher, including a Mac computer, an iPad, and a mobile phone. Gallagher forensically examined these devices and found no evidence that Anthony had misappropriated Gallagher trade secrets.[31]

After Anthony moved from Gallagher to Oswald, some of his former customers transferred their business from Gallagher to Oswald: Olympic Steel, Things Remembered, Ohio Associated Enterprises, Integrity Realty Group, Akron Public Schools, Etna Supply, National General, and Monarch Teaching Technologies.[32] Before Oswald accepted these accounts, each transferring account signed an affidavit confirming that Anthony had not solicited them to transfer their business from Gallagher to Oswald.[33]

In addition to these client losses, former Gallagher employees Tracey Jaycox and Kristen Maslowski left Gallagher to take jobs at Oswald. Gallagher employee Tara Zick likewise left

---

[29] Tr. 184.
[30] Doc. 42 at ¶ 10.
[31] *Id*. at ¶ 26.
[32] Plaintiff offered no evidence at trial concerning Monarch Teaching Technologies or National General.
[33] Def. Exs. 75, 78, 81, 108, 124, 125, 126.

Gallagher for employment with a Gallagher client, Olympic Steel. These employees testified that Anthony did nothing to solicit them to come to Oswald or Olympic Steel and that they generally worked under other supervisors at Oswald. They also testified that they had had no advance warning that Anthony was leaving Gallagher for Oswald and that after Anthony gave notice that he was leaving Gallagher, Gallagher leadership had told them that their positions were secure for only a limited time.

*Tara Zick Departs Gallagher*

On November 12, 2015, Gallagher Senior Account Manager Tara Zick, who worked closely with Anthony, resigned from Gallagher. Zick accepted a Director of Human Resources position with Olympic Steel, a Gallagher client.[34] Before coming to Gallagher, Zick had previously worked five years for Olympic. Both of Zick's sisters worked at Olympic and her brother-in-law held a high level position at Olympic.

Plaintiff Gallagher alleges that Anthony somehow fomented Zick's move to Olympic. Gallagher also argues that Anthony solicited Olympic to transfer its account to Oswald.

Olympic Steel Vice-President and Treasurer Rich Manson hired Tara Zick. Manson testified that he had known Tara Zick since 1997 when Zick worked at Olympic before she took a job at Gallagher; that Olympic had a dire need for Zick; that Zick's two sisters and brother-in-law worked at Olympic and that Zick's brother-in-law, an Olympic executive, had hired Manson. More important, Manson testified that Defendant Anthony did nothing to encourage Manson to hire Zick and did not do anything "in any way, shape, or form to solicit [Olympic's] business" to

---

[34] Tr. 108:10-19.

Oswald.[35] Manson further testified that he hired Zick because of the abrupt departure of his HR

Director and the impending maternity leave of his benefits manager.[36]

*Olympic Steel Changes Its Broker of Record from Gallagher to Oswald*

On November 20, 2015, Olympic Steel Vice-President and Treasurer Rich Manson told

Gallagher Vice-President Mark Alder that Olympic Steel planned to change its Broker of

Record from Gallagher to Oswald.[37] Rich Manson testified that he was neighbors with Oswald

CEO Bob Klonk and that Klonk had gently solicited Olympic's benefits business for years.

Olympic Vice-President and Treasurer Manson also described being offended at

Gallagher's treatment after Manson started Olympic's change of broker. After Manson had

started the change of broker process, Gallagher's Area President Mark Adler sent Manson an

email asking to meet with Manson. Manson responded and agreed to meet with Adler, but Adler

never followed up.

Although Olympic's Manson testified that neither Oswald nor Anthony had solicited

Olympic's move to Oswald, Gallagher argues that Oswald indirectly solicited Olympic's

business. On a Sunday morning in late October or early November, 2015, Rich Manson was in

his driveway when Klonk drove by and shouted from his car, "Got big news coming down the

road; can't talk about it," and drove away.[38] The next morning, Anthony called Manson to let

---

[35] Tr. 687:45-688:1.
[36] Tr. 685:10-687:20.
[37] Tr. 684:4-15.
[38] Tr. 669:16-24.

him know he was resigning from Gallagher. Manson responded, "Let me guess. You're going to Oswald," and Anthony responded, "Yes I am."[39]

From the time Anthony told Manson that he was leaving Gallagher, Anthony "[p]retty much . . . had no contact with us."[40]

Klonk testified that Manson called him to express interest in doing business with Oswald. Klonk says he told Manson that Anthony "couldn't work on the account and couldn't have anything to do with the account, and we would honor the [Gallagher non-service] agreement."[41]

*Tracey Jaycox Departs Gallagher*

On December 22, 2015, Tracey Jaycox resigned her employment at Gallagher to accept a position at Oswald.[42] Jaycox applied online for the Oswald position on November 6, 2015.[43] Oswald offered her a position on December 17, 2015, and she resigned from Gallagher on December 22, 2015. At Oswald, Defendant Anthony does not supervise Jaycox.[44]

Jaycox testified that she left Gallagher for Oswald because of concern that she would lose her Gallagher position. She testified that after Anthony resigned, Gallagher Vice-President Marc Adler took Anthony's team to lunch. At that lunch, Gallagher Vice-President Adler told Jaycox and other employees: "at least for next 90 days, we should feel safe, but beyond that, depending upon what occurred with clients, that we would have to reevaluate at that point."[45]  After Adler's

---

[39] Tr. 669:25-670:17.
[40] Tr. 688:24-25.
[41] Tr. 198:1-4.
[42] Tr. 123:18-25; Pl. Ex. 70.
[43] Tr. 492:21-493:16.
[44] Tr. 327:20-22.
[45] Tr. 503:16-28.

statement that employment beyond 90 days was uncertain, Jaycox began looking for positions

with her skill set and applied to Oswald in response to an Oswald web-site job posting.

Jaycox also testified that she did not enjoy working with Gallagher supervisor Marc

Waite after Anthony had left. She testified that working with Waite was a "tenuous and stressful"

experience. Jaycox said, "it wasn't a collaborative approach as I was used to when Mr. Anthony

was on board. It was more condescending and barking of orders, being told what to do as

opposed to being asked what was the best way to approach a client."[46]

*Kristen Maslowski Departs Gallagher*

On January 4, 2016, Gallagher employee Kristen Maslowski left Gallagher to accept a

position at Oswald. She confirmed her resignation in a January 6, 2016 email to Human

Resources. Maslowski had previously applied for a job at Oswald in 2012.[47]

Maslowski learned of Anthony's resignation at the same group meeting with Anthony,

other members of the team, and Gallagher Vice-President Mark Alder. Before the meeting,

Anthony had said nothing to Maslowski about leaving Gallagher. Maslowski, like Jaycox, says

that Mark Alder told the lunch group that after Anthony's departure their jobs might not be

secure in three months.[48] Like Jaycox, Maslowski also testified that the supervisor who replaced

Anthony, Marc Waite, treated Maslowski and other employees poorly and told them not to worry

about responses to clients.[49] On November 30, 2015, Maslowski applied for a job with Oswald.

---

[46] Tr. 505.
[47] Tr. 413:4-8.
[48] Tr. 431:4-15.
[49] Tr. 433-434.

Maslowski now works as an Oswald client manager. John Fasola supervises her.[50]  She typically does not work for Anthony. Maslowski also testified that at Oswald, she currently services Cuyahoga County accounts among others.[51]

*Things Remembered Changes Its Broker of Record from Gallagher to Oswald*

On December 29, 2015, Gallagher's client Things Remembered gave Gallagher notice of its intent to terminate services with Gallagher. Things Remembered had used Gallagher since 2012. Although using Gallagher since 2012, Things Remembered Director of Benefits and Compensation Vicki Psenak had not been completely satisfied with Gallagher and had requested proposals from other brokers while Gallagher provided insurance services. Things Remembered moved their business to Oswald in 2016.[52]

Things Remembered Benefits Director Psenak testified that Anthony called her to say he was leaving Gallagher but did not tell her where he was going.[53] Psenak testified that after Anthony left Gallagher, she decided to look at other options because she did not know anyone at Gallagher besides Anthony and Zick.[54]

Psenak gave notice that she would terminate her Gallagher contract before researching other insurance broker options. She eventually considered three other insurance agency companies and spoke to two of them. Oswald was one of those companies.

---

[50] Tr. 412:17-18.
[51] Tr. 427:2-9.
[52] Tr. 441:15-22.
[53] Tr. 442:9-22.
[54] Tr. 443:2-15.

Psenak looked at Oswald because Danny Fedelli, an employee benefits agent at another broker, called her to try to solicit her business. In that conversation, Fedelli mentioned that Anthony landed at Oswald.[55] Psenak testified, "I thought if it was a company that Kyle [Anthony] went to that it was someone I should talk to."[56] Psenak says she went online, looked up Oswald, and found Bob Klonk's phone number.[57] Psenak testified that she understood that if she went to Oswald, Anthony would not be able to service her account.

### *Ohio Associated Enterprises Changes from Gallagher to Oswald*

On January 4, 2016, Ohio Associated Enterprises changed from Gallagher to Oswald. When Gallagher serviced Ohio Associated Enterprises, Anthony's primary contact was Vice-President of Administration Joan Venaleck. Venaleck testified that she felt Gallagher's service quality had "tapered off" over time.[58] After Anthony left Gallagher, in October and November 2015, Venaleck interviewed other brokers about taking over the Ohio Associated account.

At the suggestion of Ohio Associated's accountant, Venaleck contacted Bob Klonk when Venaleck was considering changing insurance brokers. Klonk testified that he told Venaleck that Anthony would not be able to service the Ohio Associated Enterprises account.[59] Venaleck testified that Anthony did nothing to encourage or facilitate Ohio Associated's move to Oswald.[60]

---

[55] Tr. 444:15-445:8.
[56] Tr. 444:11-13.
[57] Tr. 444:7-8.
[58] Tr. 711:19-25.
[59] Tr. 202:7-24.
[60] Tr. 714:22-25.

*Integrity Realty Group Changes Its Broker of Record from Gallagher to Oswald*

On January 8, 2016, Integrity Realty Group ("IRG") gave Gallagher notice that it would change its broker of record from Gallagher to Oswald. Gallagher Area President Alder responded to IRG Managing Member Rich Brown by email: "I understand, Rich. I would like to arrange a time to speak with you about your decision."[61] Brown responded asking Alder for some dates and times to meet. Alder never followed up.[62] IRG completed its change of broker to Oswald.

IRG Managing Member Rich Brown was Anthony's primary IRG contact. Brown testified he considered Anthony a friend.[63] Brown testified that when Anthony told him he was leaving Gallagher, Brown asked him where he was going, but Anthony responded that he couldn't divulge that information.[64] Brown testified that he could not remember how he finally learned Anthony was going to Oswald—it was either through a Crain's announcement or Anthony telling him directly.[65]

IRG Managing Member Brown testified that beginning in 2014, Gallagher's service became an issue.[66] Brown and his benefits manager concluded "that with the problems we were having [with Gallagher's service], we just did not have confidence in keeping our business where it was." Once Brown and IRG realized Anthony was leaving Gallagher, they decided to move their business elsewhere; Anthony had been the Gallagher person who had solved IRG's problems.[67]

---

[61] Def. Ex. 20.
[62] Tr. 273:19-21.
[63] Tr. 218:7-8.
[64] Tr. 218:9-24.
[65] Tr. 219:6-7.
[66] Tr. 221:6-11.
[67] Tr. 231:15-22.

Brown testified that Gallagher did not do "anything, to try and transition [the IRG] account to another broker."[68]  After this inaction and with Gallagher's past service problems, Brown's "mind [was] made up that Gallagher was no longer going to provide [IRG] with any type of brokerage services."[69]

After learning that Anthony was going to Oswald, Brown testified that he either found Oswald's Chief Executive Bob Klonk's contact information online, or that Anthony gave him Klonk's contact information.[70] Klonk testified that Brown reached out to him by telephone.[71] Brown also testified that Anthony did not "in any way, shape, or form try and tell [Brown] to take [his] business from Gallagher to Oswald."[72]

After Anthony had left Gallagher and before IRG moved to Oswald, near December 1, 2015, Anthony spent a day with Brown to help IRG's open enrollment process.[73] Because of a scheduling conflict, Steve Hopp could not assist IRG himself.[74] Neither could Gallagher's other account representatives.[75]  Anthony helped IRG at Gallagher employee Steve Hopp's request.

Gallagher argues that Defendant Anthony indirectly solicited Brown to bring the IRG business to Oswald. Before Brown's deposition, Defendant Anthony took Brown and a dozen others to dinner and a Cavalier's game. Brown had already placed the IRG business with Oswald long before the basketball game. Brown did not pay for dinner or the tickets. Brown testified that he did not sit with Anthony at the game and did not discuss IRG's insurance or brokerage

---

[68] Tr. 239.
[69] Tr. 240.
[70] Tr. 228:5-13.
[71] Tr. 207.
[72] Tr. 240.
[73] Tr. 234.
[74] Tr. 958:24-959:14.
[75] *Id.*

services.[76] Prior to that event, Brown and Anthony had not attended a sporting event together for several years.[77]

*Akron Public Schools moves from Gallagher to Oswald*

Two months after Anthony left Oswald, on February 8, 2016, the Akron Public Schools changed its broker from Gallagher to Oswald. Ryan Pendleton, the Akron Schools Treasurer and Chief Financial Officer, made the decision. Pendleton had earlier worked with Anthony when Anthony was at Gallagher.

Akron Public Schools had service problems with Gallagher before Anthony left. Anthony provided responsive service but other Gallagher service was weak.[78]  When Anthony left Gallagher, Pendleton reached out to Gallagher employee Steve Hopp. In response, Hopp's service "was not great, not the kind of level of service [Pendleton] would expect."[79]

No direct evidence shows that Anthony ever directly told Pendleton that Anthony was going to Oswald. Pendleton communicated by text with Anthony on November 13, 2015 and asked about Tara Zick's "transition" as well as whether there was "*any news with you?*" Anthony responded, "I will give you a shoutout. Easier to discuss live."[80] Pendleton testified that Anthony never told him where he was going after leaving Gallagher.[81]

Pendleton testified that after Anthony left Gallagher, Pendleton was not satisfied with the Gallagher service. He said "there didn't seem to be a lot of priority that we were getting from

---

[76] Tr. 239-44.
[77] *Id.*
[78] Tr. 464:23-25. Ryan Pendleton, the Akron Schools Chief Financial Officer, testified:

    Q.      What was it that prompted that decision to leave Gallagher and join Oswald?

    A.      Service. It was primarily service driven.
[79] Tr. at 466:30-32.
[80] Pl. Ex. 27; Tr. at 470:25-471:17.
[81] Tr. 472.

Gallagher in terms of response time was long."[82] Pendleton said Akron Public Schools decided to change brokers because of a "lack of service and support" from Gallagher.[83]

*Etna Supply Changes Its Broker from Gallagher to Oswald*

On February 23, 2016, Etna Supply gave notice of a change of Broker of Record from Gallagher to Oswald. Angela Oberlin, Etna Supply's Vice-President of Human Resources and Administration, made the decision.[84] Etna Supply used Anthony for fifteen years. Etna Supply used Gallagher as its broker for three or four years while Anthony worked there. While Oberlin was very happy with Anthony, Gallagher's service otherwise "showed a lack of attention to detail," "didn't look at the big picture," and showed a "lack of strategic planning."[85]

Etna Supply's Vice-President Oberlin learned that Anthony was leaving Gallagher "after he left."[86] Oberlin was "very" concerned that Etna would be lost in the shuffle, had lost its "strategic planning partner," and "wouldn't have someone working with [her] on Etna's behalf to manage [their] benefits."[87] No one from Gallagher reached out to Oberlin and she "was very surprised that [she] only received a form letter letting [her] know that Kyle [Anthony] was no longer with the organization, and [she] was surprised that no one in any sort of management capacity reached out [to Oberlin or Etna]."[88] Oberlin testified that Gallagher's failure to contact her was "fairly offensive." "While we might not be one of Gallagher's largest clients, I feel that we were a partner with them, and I would have appreciated the fact of being reached out to."[89]

---

[82] Tr. 473:15-18.
[83] Tr. 474:5.
[84] Tr. 692.
[85] Tr. 694.
[86] Tr. 695.
[87] *Id.*
[88] Tr. 696.
[89] *Id.*

Oberlin also testified that Defendant Anthony made no contact with her after he left Gallagher and she received no notification that Anthony had joined Oswald. She testified Anthony did not make any "attempt to solicit the business of Etna in any way, shape, or form."[90]

Etna Supply's Vice-President Oberlin reached out to Gallagher's Steve Hopp, Anthony's former partner. From past experience with Hopp, Oberlin did not want to shift Etna's accounts to Hopp. Hopp told Oberlin that Defendant Anthony had gone to Oswald. Etna's Oberlin then called Oswald and asked to speak to Oswald's Chief Executive, Bob Klonk.

Bob Klonk testified that Oberlin reached out to him about Oswald servicing Etna's account. Klonk says he told Oberlin that Anthony would not be able to service the account and that Oberlin was comfortable with that.[91]

Plaintiff Gallagher argues that emails between Anthony and Oberlin[92] demonstrate that Oberlin knew of Anthony's departure from Gallagher before he left. Gallagher says Oberlin lied when she testified that Anthony had not told her that he was going to Oswald. But, those emails do not mention Oswald in any way. In effect, Gallagher argues that Oberlin gave false testimony when she testified that Anthony had nothing to do with her account change to Oswald and has had nothing to do with servicing Etna's account at Oswald.

*National General Changes Its Broker from Gallagher to Oswald*

On March 22, 2016, National General changed its broker from Gallagher to Oswald. Anthony did not solicit the change and has not worked on the account since it came to Oswald.

---

[90] *Id.*
[91] Doc. 83 at 204.
[92] Pl. Exs. 35, 47.

Robert Klonk, Oswald's Chief Executive, testified that National General's Human Resources Vice-President Nicole Pemberton approached him by email in December 2015. He had no previous contact with Pemberton.[93]  Eventually, Oswald obtained the National General account. Gallagher gives no direct evidence that Anthony solicited the account or ever serviced the account after it went to Oswald. Gallagher does show that former Gallagher employee Kristen Maslowski—who had not signed any non-service or non-compete agreement—serviced the National General account at Oswald.

*Anthony Services Cuyahoga County at Gallagher*

Gallagher alleges that Cuyahoga County was a sales prospect under Anthony's Employment Agreement and that the Agreement prevents Anthony from soliciting or servicing Cuyahoga County.

Defendant Anthony admits soliciting and servicing Cuyahoga County but denies that Cuyahoga County was a Prospective Account at Gallagher, or that he was forbidden from soliciting or servicing Cuyahoga County.

For two years after separation, the Employment Agreement generally forbids Anthony from providing insurance services or benefit services for any Gallagher "Prospective Account." The Employment Agreement defines Prospective Account as a customer who within the year before the employee termination (1) Gallagher had submitted a proposal; (2) Gallagher had material contact with or acquired confidential information from; or (3) Gallagher had reimbursed travel or entertainment expenses for.

---

[93] Tr. 172.

Case No. 16-cv-00284
Gwin, J.

Gallagher contends that Cuyahoga County could become a Prospective Account because one of its employees had heard that Cuyahoga County might be looking to change its insurance broker at some future time. On October 19, 2015, Tara Zick told Anthony that Cuyahoga County could potentially separate from its current insurance consultant. Zick received this rumor from an insurance carrier representative. As a public political subdivision, Cuyahoga County would make a public request for proposals. "[E]veryone is permitted to participate and earn the right to win that business."[94]

More than a month later in January 2016, Cuyahoga County publicly requested insurance consultant proposals. Defendant Anthony was already at Oswald. After the public request for proposals, Cuyahoga County received proposals. Oswald applied for and received the contract. In this lawsuit, Gallagher contends that Cuyahoga County was a Gallagher prospect that Anthony could not solicit.

On April 16, 2016, Anthony signed a consulting agreement with Cuyahoga County on behalf of Oswald. Before Anthony left Gallagher, Gallagher never submitted a proposal to Cuyahoga County.[95]  Gallagher shows no entertainment or travel expenses it had reimbursed for Cuyahoga County. Nor does Gallagher show having received any confidential information from Cuyahoga County. Anthony received only the rumor that Cuyahoga County might look for a new broker sometime in the future. Gallagher also received that rumor from an insurance company salesperson who presumptively was giving the same information to all the other insurance brokers he dealt with.

---

[94] Tr. 556.
[95] Tr. 264:16-20.

## II.  Law and Discussion

### A.  Validity of Restrictive Covenant

In general, restrictive covenants are agreements between an employer and an employee restricting the employee's work when the employee leaves employment.[96] Often, restrictive covenants include non-compete provisions. In this case, Gallagher had no non-compete agreement with Anthony. Instead, Gallagher and Anthony agreed that for two years after leaving Gallagher, Anthony would not service customers that Anthony had serviced at Gallagher. The Gallagher-Anthony restrictive covenant also limited Anthony from soliciting or servicing accounts where Gallagher had made a formal proposal or had entertained the customer.

Because employment agreement restrictive covenants restrain trade and competition, they are scrutinized carefully to ensure their intended effect is not to prevent competition, but to protect a legitimate business interest. A legitimate business interest is more likely found when the employer gives the employee access to customer confidential information, or the employer's customer relationships are near permanent and the employee would not have had contact with the customers without his or her employment.

Unless there is a valid restrictive employment agreement, employees are free to compete against former employers. As described in the Restatement of Employment Relations, our legal system promotes "the public interest in competition and in employee mobility by recognizing that when employees go to work for new employers they may take advantage of the general skills and training they obtained during the course of their former employment."[97]  Like Medieval Guildhalls, restrictive covenants stop competition and keep employees from working

---

[96] *See* Restatement of Employment Law §8.06.
[97] Restatement of Employment Law §8.05.

where they are most productive. Employment restrictions diminish productivity. They make our society less wealthy as they restrain trade.[98]

Ohio courts disfavor restrictive covenants.[99] A restrictive covenant is enforceable only if the employer can show by clear and convincing evidence that the restrictions imposed (1) are no greater than necessary for the protection of the employer's legitimate business interests, (2) do not impose undue hardship on the employee, and (3) are not injurious to the public.[100]

Defendant Anthony first challenges whether Plaintiff Gallagher has a legitimate business interest sufficient to support the Anthony restrictive covenant. An employer can have a legitimate protectable interest in the employer's trade secrets and other confidential information; customer relationships; investment in the employee's reputation in the market; or a purchase of a business owned by the employee.[101]

The crux of the Ohio test is whether the restrictions are reasonable to protect an employer's legitimate business interests.[102] Mere restraint of competition can never be a legitimate business interest. Unless Gallagher can show a protectable interest, it cannot restrain Anthony's competition for customers or service.

In claiming a legitimate business interest sufficient to justify restraining competition, Gallagher identifies: (1) Anthony was a key employee with access to Gallagher client

---

[98] *See* Daron Acemoglu and James A. Robinson <u>Why Nations Fail: The Origins of Power, Prosperity, and Poverty</u>, Crown Publishers, 2012, pg. 74. "To be inclusive [successful], economic institutions must feature secure private property, an unbiased system of law, and a provision of public services that provides a level playing field in which people can exchange and contract; it also must permit the entry of new businesses and allow people to choose their careers."

[99] *MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 962 (N.D. Ohio 2009).

[100] *See Raimonde v. Van Vlerah* 325 N.E.2d 544, 546–48 (Ohio 1975); *see also* Restatement of Employment Law §8.06.

[101] *See* Restatement of Employment Law §8.07.

[102] *MP TotalCare Servs.*, 648 F. Supp. 2d at 962.

relationships; (2) Anthony had access to Gallagher information that Gallagher says are trade secrets or confidential; and (3) Gallagher had a business interest in protecting its investment in its purchase of the Behnke Agency, Anthony's former employer.[103]

Employers have a stronger protectable interest when the customers are more customers of the firm rather than customers who came to the firm because of the employee. Protectable interests can arise when the employee works with the employer's long-time customers, especially customers who came to the employer before the employee came on the scene. Similarly, where many employees service the customer, the employer has more protectable interest. But when the firm has little or no effect on bringing the customer to the firm, we find little protectable interest.

More generally, employers make a greater showing of a protectable interest when the employer can show evidence that the customer came to the employer; not to the employee. But when customers follow the employee, especially to a new employer, the former employer has less claim to a protectable interest in the customer's account.

Gallagher shows little protectable interests in Anthony's business relationships. Anthony did not start his insurance broker career with Gallagher. Gallagher gave Anthony no real training, did not introduce Anthony to preexisting Gallagher customers, and provided minimal direction.

Instead, Anthony came to Gallagher with a book of business that benefitted little from the Gallagher relationship. No evidence showed that Anthony's clients came to him because of Gallagher. Gallagher Area President Mark Adler testified that Anthony was invited but attended

---

[103] *See* Doc. 91 at 6, Page ID 4485.

only "a number" of Gallagher company-wide business meetings.[104] The Hopp-Anthony group

largely operated independently within Gallagher.

Defendant Anthony principally sold and serviced employee benefit programs. With

Anthony's long and successful experience with insurance sales, Gallagher gave Anthony

minimal training. Regarding support, Gallagher funded support personnel but had little role in

choosing or training the Anthony-Hopp group's support personnel.[105]  And Gallagher refused

Anthony's request for added support. Anthony testified that his team members needed to work

60 - 70 hours per week because of Gallagher's lack of support.[106]

Customers saluted Anthony's support and complained of Gallagher's.[107]  Akron Public

School Treasurer and Chief Financial Officer Ryan Pendleton gave typical testimony: Anthony

gave superior service but Gallagher's was lacking.[108]

---

[104] Tr. 67.

[105] Tr. 88 – 89. Gallagher Area President Adler testified:

> Q.    Okay. I would like to ask you a little bit about Mr. Anthony's staff support. Did Gallagher assist in building a team of staff to support Kyle Anthony's book of business?
>
> A.    Well, I would say that Gallagher assisted in funding the staff support. I think that Kyle and his partner Steve really had responsibility, for large part, in selecting the individuals they wanted on their team and then how they were employed and so forth, but Gallagher certainly funded it as they do every employee.

[106] Tr. 721.

[107] *See* Mark Adler testimony at Tr. 135.

[108] Tr. 464 – 465. Pendleton testified:

> Q.  What was it that prompted that decision to leave Gallagher and join Oswald?
>
> A.  Service. It was primarily service driven.
>
> * * *
>
> Q.  Let me clarify, who at Gallagher was giving you the problems?
>
> A.  I don't know if it was one specific person but just an overall response.
>
> Q.  Were there problems with Kyle?

Anthony and Hopp prospected independently from other Gallagher benefit insurance salespeople. Neither Anthony nor Hopp serviced accounts that Gallagher developed before Anthony came to Gallagher.  Hopp and Anthony either brought their accounts to Gallagher or personally developed their accounts after coming there.

Gallagher shows little or no protectable customer information. ERISA requires disclosure of brokers, fees, and commissions and makes that information publicly available. In attempting to describe what customer information was given to Anthony that created a protectable business interest, Gallagher Vice-President Mark Adler gave silly testimony that Gallagher protectable information was information regarding whether clients "like to go to a restaurant"; "Do they like to eat out? Do they prefer movies? Do they have special things they might like to do with their spouses?"[109]

With this argument, Gallagher turns Adam Smith on his head. Smith, of course, argued that businesses make rational purchase decisions based upon cost and marginal utility. According to Gallagher, its customers make whimsical employee benefit purchase decisions based upon whether a salesperson knows the restaurants and movies the purchaser prefers.

Plaintiff Gallagher makes a somewhat better argument that its 2010 Behnke Agency purchase gave it a protectable business interest in restricting Anthony's client solicitation. Anthony owned five percent of the Behnke agency and received a substantial payment when Gallagher bought Behnke.[110]  Gallagher's Behnke Agency purchase gives Gallagher more of a protectable interest. However, the Behnke purchase occurred five years before Anthony left

---

A. Kyle was always attentive. He always responded to me.
[109] Tr. 79.
[110] With the Behnke purchase, Anthony received $750,000 to purchase his Behnke stock.

Gallagher. Any protectable interest in protecting the Behnke purchase dissipated over the

subsequent five years.

To summarize, Plaintiff Gallagher shows little evidence of a protectable interest

sufficient to support its restrictive covenant. Nothing suggests the Anthony's customers came to

Anthony because they were long-time Gallagher customers or because of Gallagher's reputation.

Gallagher provided Anthony almost no sales leads. To the contrary, Anthony and Hopp brought

customers to Gallagher who stayed in spite of Gallagher's poor support. And while Gallagher's

Behnke Agency purchase gives Gallagher some protected interest, that purchase occurred five

years before Anthony left Gallagher.

Even if Gallagher could show a protectable interest, it must also show that the restriction

is reasonably tailored in scope, geography, and time to protect Gallagher's interest. In assessing

the reasonableness of such contractual restrictions, courts consider:

> whether the covenant imposes temporal and spatial limitations,
> whether the employee had contact with customers, whether the
> employee possesses confidential information or trade secrets,
> whether the covenant bars only unfair competition, whether the
> covenant stifles the employee's inherent skill and experience,
> whether the benefit to the employer is disproportionate to the
> employee's detriment, whether the covenant destroys the
> employee's sole means of support, whether the employee's talent
> was developed during the employment, and whether the forbidden
> employment is merely incidental to the main employment.[111]

---

[111] _Raimonde_, 325 N.E.2d at 547;  _see also_ _FirstEnergy Sols. Corp. v. Flerick_, 521 F. App'x 521, 525 (6th Cir. 2013)
(advising that employee possession of confidential information is not dispositive alone, and that the list of factors
are to be assessed as a whole).

In some cases, Ohio courts have found two-year restrictive covenants to be reasonable.[112] Client-specific restrictions are also more likely to be reasonable.[113]

The employer has the burden of proving the restraint reasonable and the contract valid.[114] If a covenant imposes an unreasonable restriction, courts can modify the agreement to the extent necessary to protect the employer's legitimate interest and enforce the covenant as modified.[115]

This Court will now consider the *Raimonde* factors. The restriction has a two-year time limitation and applies only to protected and prospective accounts.[116]

Defendant Anthony brought most of the accounts to Gallagher. Nothing suggests the accounts had any Gallagher history before Anthony. No evidence shows the customers came to Gallagher because of Gallagher's reputation. And no evidence shows that Gallagher employees apart from the Anthony-Hopp group had obtained or serviced any of Anthony's accounts.

Anthony had access to client information as the Gallagher client contact.[117] But he developed that information; Gallagher did not give it to him.

Because the covenant only had a non-solicitation provision as opposed to a non-compete, it is less restrictive on competition. The covenant left most potential clients unaffected.

---

[112] *Life Line Screening of Am., Ltd. v. Calger*, 881 N.E.2d 932, 942 (Ohio 2006) (holding a two year non-compete period was reasonable); *Parma Internat'l., Inc. v. Herman*, No. 54243, 1989 WL 12928, *2–3 (Ohio Ct. App. Feb. 16, 1989) (five years is reasonable); *Raimonde*, 325 N.E.2d at 544 (upholding three-year limitation); *Wall v. Firelands Radiology, Inc.*, 666 N.E.2d 235 (Ohio Ct. App. 1985) (three-year limitation permitted).
[113] *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 734 (S.D. Ohio 2006); *see also Premix, Inc. v. Zappitelli*, 561 F. Supp. 269 (N. D. Ohio 1983).
[114] *Id*.
[115] *Id*.
[116] Doc. 1-1 at 19-20.
[117] Tr. 93-105; Tr. 597:4-7.

As to the client-contact factor, protecting customer relations can be a protectable interest.[118] This interest can extend to customer relationships protected under covenants.[119] Even though customer contact and business information may be publicly available, a protectable interest may arise where the restricted information has advantages over equivalent publicly available information.[120]

But here, Gallagher failed to show its client information had some advantage over public information. Non-public entities that file an ERISA 5500 form disclose the identity of their broker and their fees and commissions. These forms are readily available, meaning the information they contain is not confidential or protected as a trade secret.

In attempting to show that Anthony received access to undisclosed information, Gallagher offered evidence that Anthony knew information about client restaurant and movie preferences. This kind of information does not rise to the level of a protectable interest.

Moreover, Gallagher did not show that Anthony's talent was developed during the employment. To the contrary, it seemed that Gallagher gave Anthony almost no training or supervision. Anthony had already developed extensive talent while working for Behnke &

---

[118] _Penzone, Inc. v. Koster_, 2008-Ohio-327, ¶ 22, 2008 WL 256547, at *4 (Ohio Ct. App. Jan. 31, 2008) (citing _Miller Medical Sales, Inc. v. Worstell_, 1992 WL 31988 (Ohio Ct. App. Feb. 18, 1992)).

[119] _See Ticor Title Ins. Co. v. Cohen_, 173 F.3d 63, 72 (2d Cir. 1999) (finding protectable interest in retaining present customers after departure of "star" insurance salesman); _Columbus Medical Equip. Co. v. Watters,_ 468 N.E.2d 343, 346–47 (Ohio Ct. App. 1983) (affirming trial court's grant of injunctive relief to a medical supply company where a former salesperson took customer lists and used the lists at competing medical supply company in violation of the salesperson's non-compete agreement).

[120] _Nat'l Interstate Ins. Co. v. Perro_, 934 F. Supp. 883, 887 (N.D. Ohio 1996) (holding that there was a protectable interest over preventing ex-employees from using a prospect list, where publicly available sources were often incomplete, out-of-date, and not compiled in the fashion used by Plaintiff's business).

Company, Inc., and other firms. Gallagher acquired Behnke in 2010. Plaintiff concedes that Anthony was already a key Behnke employee when Gallagher acquired Behnke.[121]

Undoubtedly, Gallagher invested time and money into supporting and developing the Anthony-Hopp team and book of business.[122] And, Anthony developed customer relationships throughout his employment.[123] But this Court is unconvinced that those customer relationships alone constitute a sufficiently legitimate business interest to support the restrictive covenant.

### B. Anthony's Alleged Solicitation

Ultimately, whether the restrictive covenant was valid is not central to this Court's inquiry. Even if the restrictive covenant had been valid, this Court finds that Gallagher failed to show that Anthony violated the covenant.

Gallagher admits that it does not have any direct evidence of solicitation.[124] Instead, Gallagher attempted to set forth a solicitation claim based on indirect and circumstantial evidence. The proffered evidence is precarious at best and ultimately fails to demonstrate that Anthony solicited any current or prospective Gallagher customers.

### 1. Indirect Solicitation

Without evidence that Defendant Anthony directly solicited his past customers, Gallagher focuses on Oswald's use of social media as evidence of Anthony's indirect

---

[121] Doc. 91 at 53.
[122] Tr. 81-90; Tr. 837-839.
[123] Tr. 217:18-21 (Integrity Realty Group contact); Tr. 440:22-441:1 (Things Remembered contact); Tr. 460:16-19 (Akron Public Schools contact); Tr. 888:10-14 (Olympic Steel contact); Tr. 692:19-25 (Etna Supply contact); Tr. 709:17-25 (Ohio Associated Enterprises contact).
[124] Tr. 22: 9-16.

solicitation. Specifically, Gallagher argues that Oswald's press release on LinkedIn[125] is bulk

advertising and is indirect solicitation under _Harris v. University Hospitals of Cleveland_.[126] In

_Harris_, University Hospitals advertised an employee's new position by placing advertisements in

multiple area newspapers over two months and bulk mailed approximately 35,000 postcards to

residents around specific office locations.[127]

Unlike _Harris_, Oswald made one LinkedIn and Twitter press release about hiring

Anthony.[128] Nicole Pemberton of National General may have learned that Anthony went to

Oswald on the internet,[129] and Rich Brown of IRG possibly learned that Anthony went to Oswald

through a third party news outlet.[130] But, the volume of online advertising by Anthony and

Oswald is insufficient to qualify as bulk-advertising indirect solicitation.[131]

Plaintiff also alleges that Anthony indirectly solicited Jaycox and Maslowski to leave

Gallagher for Oswald employment.[132] Plaintiffs cite an out-of-circuit unpublished district court

case, _Movement Mortgage, LLC v. Ward_, for the proposition that temporal proximity between

the communications of former employees and the transfer of employment could be

circumstantial evidence violating a non-solicitation agreement.[133] However, Ohio and the Sixth

Circuit have yet to clearly endorse the use of purely circumstantial evidence of indirect

---

[125] Tr. 291.
[126] No. 76724, 2002 WL 363593, at *2 (Ohio Ct. App. Mar. 7, 2002).
[127] _Id._ at 2.
[128] Tr. 291-92.
[129] Tr. 200:1-10;
[130] Tr. 219:4-7.
[131] The Court acknowledges the wide reach of social networking and the fact that Olympic Steel Vice-President Rich Steel "liked" the Oswald post regarding Anthony's new position, but notes that Oswald has around 1500 connections on LinkedIn and only seven total users "liked" the post.
[132] Doc. 91 at 29.
[133] No. 3:14-CV-23-RJC-DCK, 2014 WL 880748, at *2 (W.D.N.C. Mar. 6, 2014) (granting injunctive relief based on a likelihood of success based on the merits).

solicitation as dispositive grounds for breach of contract.[134]  While circumstantial evidence can

be considered, it must still be sufficient to establish the solicitation. Here, time proximity is

insufficient to show Jaycox and Maslowski were solicited by Anthony.

Gallagher showed no direct evidence that Anthony solicited any employee to take

employment with Oswald. In fact, evidence showed just the opposite. Jaycox testified that

Anthony never solicited her to follow him to Oswald and that after Anthony left, Gallagher's

Mark Adler told Jaycox and others that employment beyond 90 days was uncertain and "that

[they] would have to reevaluate at that point."[135]

Here, Plaintiff offers only a timeline of events that include Jaycox and Maslowski

resigning from Gallagher shortly after Anthony left for Oswald. However, no evidence shows

that Anthony influenced Oswald's hiring decisions,[136] and no evidence other than the time

proximity suggests that Anthony solicited Jaycox and Maslowski's transition from Gallagher to

Oswald.[137] Defendant Anthony presented evidence indicating that Jaycox and Maslowski had

other motives for resigning from Gallagher, namely job insecurity.[138]

Furthermore, as opposed to indirect solicitation in *Ward*, there is no evidence of

communications between Anthony and Jaycox or Maslowski, outside of his normal business

duties.[139] In fact, there is no evidence to suggest that Anthony disclosed or discussed his new

---

[134] Sixth Circuit case law cited by Plaintiff in support of the use of circumstantial evidence applies to trade secret violations rather than non-solicitation or restrictive covenant breaches.
[135] Tr. 503.
[136] Tr. 339:8-15.
[137] Tr. 431:16-25; Tr. 504:2-19.
[138] Tr. 328:25-329:7, 502:22- 503:15 (Jaycox felt "threatened"); Tr. 431:2-15 (Maslowski concerned about future job prospects with Gallagher).
[139] Note that the *Ward* Court was ruling on a preliminary injunction, rather than adjudicating on a full record at trial.

Oswald employment with Jaycox or Maslowski.[140] Thus, the circumstantial time proximity evidence is insufficient to fulfill even the low bar in *Ward.*

Gallagher then argues that the timing and number of client departures from Gallagher to Oswald is indirect evidence of solicitation. This Court disagrees.

Circumstantial evidence could support an inference that Anthony violated his non-solicitation and non-service agreement for former clients or prospective clients. But the customers all testified that Anthony never solicited their business to Oswald and that Anthony has never serviced their accounts at Oswald. Also, Gallagher has given no evidence that Anthony receives any financial or other benefit from his former customers coming to Oswald.

With no evidence that Anthony solicited his former customers to come to Oswald, Gallagher makes the illogic argument that customer witnesses lied when they said that Anthony did not solicit them. Where multiple insurance brokers are continually soliciting these customers' business and where these customers had good but very little personal relationship to Anthony, no explanation is offered as to why they would perjure themselves to help Anthony.

The timing and number of client departures after Anthony left points to dissatisfaction with Gallagher's service once Anthony was no longer servicing their accounts.

Gallagher points to Bob Klonk's comment to Brown about "big news coming" as evidence of solicitation. However, Gallagher offered no testimony that the "big news" was Anthony's Oswald employment. Further, Brown made clear during his testimony that he had been dissatisfied with the Gallagher service.

---

[140] Tr. 481:22-482:22; Tr. 413:22-414:20.

Gallagher also argues that Anthony must have solicited Etna Supply Vice-President Angela Oberlin to Oswald because some email communications between Oberlin and Anthony indicate that she might have known about his departure from Gallagher sooner than she admitted in her testimony. Yet, those emails do not mention Anthony's new Oswald employment. Gallagher asks this Court to make inference upon inference in order to find evidence of indirect solicitation when the more plausible inference, supported by direct testimony at trial, is that these clients left Gallagher because they were dissatisfied with their service after Anthony left.

This Court denies Plaintiff's breach of contract claim as to indirect solicitation of Gallagher employees and protected accounts.

## 2. Direct Solicitation

Plaintiff argues that is it well established that client entertainment is important to client relationships and that Anthony's inviting IRG's Rich Brown to a Cavaliers game was "servicing" of that account in violation of Anthony's restrictive covenant.

Brown annually comparison shopped for IRG's broker relationships.[141]  After Anthony left Gallagher, Brown took IRG's account to Oswald. Brown spoke with Bob Klonk, the Oswald Chief Executive, to move the account. Anthony does not service the IRG account at Oswald.

Anthony took Brown to the Cavaliers game after Brown had already moved the IRG account to Oswald. Brown knew Anthony for more than fifteen years. They were friends. They and their wives socialized together.[142]

---

[141] Tr. 220.
[142] Tr. 219.

Plaintiff offers no evidence that Anthony's social interaction—after the account had already moved to Oswald—may be considered "servicing" in violation of a restrictive covenant. Thus, this Court finds that Anthony's mere attendance at a sporting event with Brown is no indication that Anthony's employment at Oswald was discussed and did not breach the restrictive non-servicing covenant.

Apart from this interaction, Plaintiff concedes that there is no other potential evidence of direct solicitation.[143] Anthony did not inform his clients where he was going.[144] He later told his former clients that he could not perform services for them after he began work at Oswald. Further, the clients who testified all said that they independently contacted Oswald because they wanted to leave Gallagher for various reasons related to poor customer service.

*Cuyahoga County*

Gallagher makes much about Anthony's current Oswald servicing of Cuyahoga County. The Employment Agreement limits solicitation of prospective Gallagher customers. Cuyahoga County does not meet the Agreement's definition of "prospective account."

First, Gallagher never submitted a proposal with Anthony's involvement for business with Cuyahoga County.[145] While Anthony was at Gallagher, Gallagher made no proposal for Cuyahoga County's business. Cuyahoga County needed public bidding and had not yet advertised to receive any bids. Second, Anthony incurred no travel or entertainment expenses related to Cuyahoga County while at Gallagher.[146] Third, Anthony had no material contact with

---

[143] Tr. 22:8-16; Tr. 835:2.
[144] Tr. 218:12-24.
[145] Tr. 264: 16-20.
[146] Tr. 264:21-266:0; 617:18-618:4.

Cuyahoga County while at Gallagher. At best, Anthony simply heard that Cuyahoga County's business might come up for future bid.

But Gallagher insists that Anthony had "confidential information" about Cuyahoga County while at Gallagher. The "confidential information" at play is a supposed "tip" Anthony received from Tara Zick. While at a Browns game with an insurance salesman, Gallagher's then-employee Zick was told that Cuyahoga County might look for a new benefits broker in the future. On October 19, 2015, Anthony emailed a current Gallagher client and asked for a name of an insurance benefits contact at the County.[147] After Anthony received the name of a person who might have insurance benefit responsibilities, Anthony mentioned it in passing to his supervisor Alder. Anthony never logged Cuyahoga County as a "prospective account" in salesforce.com.

This "tip" is not "confidential information" regarding Cuyahoga County. Moreover, all work for Cuyahoga County is awarded after a public bidding process.[148] Thus, Gallagher could not bid for Cuyahoga County's work until the County publicly issued its Request for Proposals in January 2016, well after Anthony's departure.[149]

Oswald obtained Cuyahoga County as a client by winning the public bidding process.[150] Anthony is free to work on the Cuyahoga County account at Oswald because Cuyahoga County was never a prospective account as defined under the Employment Agreement.

---

[147] Tr. 558; Pl. Ex. 30.
[148] Tr. 195:7-10.
[149] Tr. 556:9-23.
[150] Tr. 195:5-7.

## C. Trade Secrets

Gallagher contends that Anthony, Zick, Jaycox, and Maslowski all possess Gallagher trade secrets, including the know-how to service clients according to Gallagher's standards and practices.[151] Gallagher contends they improperly used trade secrets at Oswald or Olympic Steel and that Anthony has or intends to misappropriate Gallagher's confidential information.[152]

A "trade secret" is something that "derives independent economic value" from its secrecy. To qualify as a trade secret, the information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[153] An agreement to keep information secret or a subjective interest in keeping information confidential does not make that information a trade secret.[154]

Ohio courts have adopted the following factors in analyzing a trade secret claim:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.,* by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and

---

[151] Doc. 91 at 91.

[152] Gallagher defines the Confidential Information as "including but not limited to data related to the Company's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services; underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; criteria and formulae used by the Company in pricing its benefits product; sales data contained in various tools and resources; lists of prospects; and the identity, authority and responsibilities of key contacts at accounts and prospects; and other data showing the particularized consulting requirements and preferences of Company account; the compensation and organization of Company accounts' businesses; the peculiar risks inherent in the operation of Company accounts and other data showing the particularized consulting requirements and preferences of Company accounts." Doc. 91 at 34.

[153] O. R. C. § 1333.61.

[154] *Raymond James & Associates, Inc. v. Leonard & Co.*, 411 F. Supp. 2d 689, 696 (E.D. Mich. 2006) (citing *Merrill Lynch v. E.F. Hutton & Co.,* 403 F. Supp. 336 (E.D. Mich. 1975)).

(6) the amount of time and expense it would take for others to acquire and duplicate the information.[155]

"Misappropriation" in Ohio means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
(a) Used improper means to acquire knowledge of the trade secret;
(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;
(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.[156]

Gallagher relies on the "inevitable disclosure rule" to argue that it does not need to produce actual evidence of Anthony's misappropriation of trade secrets. According to the rule,

a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment.[157]

However, the inevitable-disclosure doctrine is applied "when a former employer seeks 'injunctive' relief when a former employee begins work with a competitor while the

---

[155] *See, e.g.*, *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000).
[156] O. R. C. §1333.61.
[157] *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio Ct. App. 2000).

noncompetition clause has not expired."[158] Here, the parties agree that Anthony was not subjected to any non-competition clause.

Further, Anthony argues that Gallagher's customer information was not a trade secret because much of the information is easily re-creatable from public sources on the internet or from customers themselves. This Court agrees. Gallagher has not shown that its customer information could be a trade secret because that information was neither secret nor "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[159]

Gallagher allowed Anthony full and unfettered access to all of its client contacts and information even after he announced his intention to work for Oswald, Gallagher's direct competitor. With knowledge that Anthony was leaving, Gallagher did nothing to restrict Anthony's access to the information. And Gallagher never asked Anthony to turn in any of the electronic equipment he used during his employment. This shows that Gallagher did not treat its electronically stored information as confidential. Gallagher also fails to show how benefit plan premiums and fees are secret when ERISA requires public filings of that information. Gallagher's misappropriation of trade secrets claim loses.

### D. Tortious Interference

In Ohio, tortious interference occurs where a "person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another."[160] The elements of tortious interference with

---

[158] *Hydrofarm, Inc. v. Orendorff*, 905 N.E.2d 658, 662 (Ohio Ct. App. 2008) (quoting *Berardi's Fresh Roast, Inc. v. PMD Ents., Inc.*, Cuyahoga App. No. 90822, 2008-Ohio-5470, 2008 WL 4681825, at ¶ 27 (Ohio Ct. App. Oct. 23, 2008).
[159] O. R. C. §1333.61(D).
[160] *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995).

a contract are "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages."[161]

Gallagher claims that Anthony, with the assistance and cooperation of Oswald, Zick, Jaycox, and Maslowski, tortiuously solicited, encouraged, and induced Gallagher's clients to terminate or modify their business relationships with Gallagher. In support, Gallagher presents a timeline where various accounts, including Olympic Steel and IRG, left Gallagher for Oswald.[162]

Gallagher has demonstrated the existence of contracts between Gallagher and its ex-clients, Anthony's knowledge of those contracts, and resulting damages from loss of those contracts. However, Gallagher has failed to provide evidence of contract breaches or Anthony's intentional procurement of the contract breaches.

First, Gallagher does not show that any customer broke any contract with Gallagher. Those customers may have chosen not to continue their contracts but that is not a breach. Second, Gallagher does not show that Anthony solicited those parties to break contracts. In fact, the only proven intentional conduct relating to these contracts is Anthony notifying clients that he was leaving Gallagher.[163] The evidence is insufficient to support the tortious interference claim.[164]

---

[161] *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995).
[162] Doc. 91 at 40.
[163] Tr. 218:12-13.
[164] Tr. 228:10-13 (possibility of Anthony providing Klonk's contact information to Mr. Brown of IRG).

Furthermore, the evidence indicates that customers left Gallagher because of Gallagher service issues.[165] The accounts left Gallagher or joined Oswald usually for service reasons but sometimes other reasons.[166] Therefore, Gallagher's tortious interference claim is **DENIED**.

## E. Injunctive Relief

A plaintiff seeking a permanent injunction must prove: (1) actual success on the merits, (2) a substantial threat that it will suffer irreparable harm without the injunction, (3) that the threatened harm outweighs any damage that the injunction may cause others, and (4) that the injunction will serve the public interest.[167]

As discussed above, Gallagher has failed to demonstrate success on the merits. Further, even if Gallagher had succeeded on the merits, it has not shown that its alleged harm could not be adequately redressed by money damages. This Court **DENIES** Plaintiff's requests for injunctive relief.

## F. Gallagher's Alleged Breach of Contract

Defendant Anthony argues that Plaintiff Gallagher breached its contract, which relieves Anthony from the duty to comply with the non-solicitation and non-service provisions of Anthony's Employment Agreement. Although Anthony argues that Gallagher broke the Employment Agreement in several ways, Anthony especially complains that in October 2015, Gallagher retroactively changed Anthony's 2014 and 2015 compensation. Anthony argues that Gallagher's retroactive change took away more than $200,000 of his 2015 compensation.

---

[165] Tr. 221:2-11; Tr. 239:18-240:3; Tr. 465:13-21; Tr. 466:7-14; Tr. 469:2-8; Tr. 472:22- 474:8; Tr. 883:7-685:1; Tr. 694:8-24; Tr. 695:18- 696:12.
[166] Tr. 443:2-19; Tr. 468:2-6; Tr. 672:20-674:15; Tr. 711:4-22.
[167] *Blue Cross & Blue Shield Mut. of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir. 1997).

If an employer materially breaches the employment agreement, it cannot enforce an otherwise valid restrictive covenant contained in the agreement.[168] This Court has already found that Anthony did not breach the restrictive covenant. Nevertheless, this Court will engage in a short analysis of the alleged Gallagher breaches of its obligations to Anthony.

A material breach of contract is "a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform."[169]

Ohio courts apply Restatement of Contracts § 241 to determine if a breach is material.[170] That analysis includes: (1) the extent to which Anthony will be deprived of the benefit which he reasonably expected; (2) the extent to which Anthony can be adequately compensated for the part of that benefit of which he will be deprived; (3) the extent to which Gallagher will suffer forfeiture if the restrictive covenant is not enforced; (4) the likelihood that Gallagher will cure its failure, taking account of all the circumstances including any reasonable assurances; and (5) the extent to which Gallagher's behavior comports with standards of good faith and fair dealing.[171]

Here, Anthony alleges that Gallagher materially breached the employment contract in six ways, primarily by withholding owed compensation through changes to his 2014 and 2015 pay.

As to other Gallagher breaches, Anthony cites (1) Gallagher's failure to reconcile his compensation within 75 days of year end, (2) Gallagher's refusal to provide him "assistance

---

[168] *Freeman Indus. Prods., L.L.C. v. Armor Metal Grp. Acquisitions, Inc.*, 952 N.E.2d 543, 551 (Ohio Ct. App. 2011); Restatement (Second) of Contracts § 237 (1981).
[169] *Marion Family YMCA v. Hensel*, 897 N.E.2d 184, 186 (Ohio Ct. App. 2008) (citing 12 Williston on Contracts § 63:3 (4th ed.)).
[170] *Freeman Indus. Prods.*, 952 N.E.2d at 551 (quoting *Ohio Edn. Assn. v. Lopez*, 952 N.E.2d 543, 551 (Ohio Ct. App. 2011)).
[171] Restatement (Second) of Contracts § 241 (1981).

which may reasonably aid [him] in performing his sales, management and/or servicing duties,"
(3) Gallagher's refusal to provide Anthony with necessary clerical customer service personnel,
(4) Gallagher's sending the Anthony Employment Agreement to Oswald, and (5) Gallagher's
Vice-President disparaging Anthony in front of Gallagher employees.

Under the Restatement, the Court finds that while Gallagher's sending the Employment
Agreement to Oswald constitutes breach, it was not a material breach. Similarly, failing to
reconcile within 75 days, inadequate assistance under the contract, and failing to provide staffing
are not sufficiently material breaches. Finally, because Anthony failed to provide evidence of
Gallagher's Vice-President openly disparaging him, that claim also fails to show a material
breach.

In his main claim of breach, Anthony alleges that Gallagher (1) withheld agreed-upon
2014 compensation without consent and (2) changed the 2015 bonus formula when 2015 was
almost over and retroactively applied the altered formula to Anthony's 2015 bonus calculation.

In its initial 2010 Employment Agreement, Gallagher agreed to pay Anthony "20.2125%
of revenues collected by the Company (or an affiliate thereof) from health and welfare insurance
written or renewed by [Gallagher] as a result of the production efforts of [Anthony]" during the
calendar year.[172]  The Employment Agreement also required that yearly compensation "shall be
reconciled" "by the 75th day" after the calendar year close.

---

[172] Pl. Ex. 1 at 7.

When Anthony's 2010 compensation was being determined, Gallagher and Anthony disagreed regarding supplemental and contingent commissions.[173]  To resolve their dispute, Gallagher and Anthony agreed in early October 2011 to an Addendum amending the Agreement.

The October 2011 Addendum Agreement resolved the dispute regarding supplemental and contingent commissions by paying Anthony "an additional [annual] $40,000 to be applied to base compensation." In the October 2011 Addendum, Gallagher and Anthony agreed that the Addendum and Employment Agreement could not be further amended without mutual agreement evidenced by a signed document. They agreed the Employment Agreement and Addendum  "shall not be further modified or amended unless such modification or amendment is reduced to a writing signed by the parties."[174]

Gallagher paid Anthony 20.2125% of his revenues in 2011, 2012, and 2013.[175]  In December 2013, Gallagher began efforts to change Anthony and Hopp's compensation for the following year. With the new Gallagher compensation proposal, Gallagher would pay Anthony and Hopp a $950,000 salary but Anthony and Hopp would receive a reduced combined sales commission of 35% on new business.[176]  Anthony and Hopp could receive an additional commission if net revenue growth grew but they would lose this commission if sales declined.

The December 2013 change reduced Anthony's ability to continue to receive continued compensation from renewed health and welfare policies and his anticipated compensation if his book of business did not continue to expand. Both Anthony and Hopp continued employment

---

[173] Tr. 844.
[174] Pl. Ex. 1.
[175] Tr. 621.
[176] Tr. 629.

44

under the December 2013 changes. In 2014, Gallagher paid Anthony consistent with the December 2013 Gallagher proposal.

Anthony argues that in October 2015, Gallagher retroactively changed his 2014 and 2015 compensation. In proposing the October 2015 changes, Gallagher's Chief Financial Officer Caraher claimed to Anthony that Gallagher had the unilateral right to change Anthony's compensation despite the 2011 Addendum's provision requiring mutual signed agreement.

The October 2015 change grandfathered the roughly 20.21% rate for 2013 and earlier years but "lower[ed] their compensation on new business."[177]  And while the December 2013 change had given Anthony a fixed salary in return for reduced commissions, the October 2015 proposal made the salary a draw that could be lost. The October 2015 change also increased the Hopp-Anthony revenue level from $4.6 million to $5.072 million before bonus or commissions apply. In future years, the commission basis would rise with greater sales. In effect, the October 2015 contract change could raise Anthony's target before future commission would be paid.

With the October 2015 change, Anthony's compensation would likely be lower in future years. And Gallagher's October 2015 change claimed the change would be retroactive to sales for the first ten months of 2015. Anthony claims this change retroactively broke his compensation agreement.

Anthony argues that Gallagher unilaterally changed Anthony's 2014 compensation seven months after Gallagher reconciled the 2014 incentive compensation. For 2014, Gallagher originally owed Hopp and Anthony a $344,170 bonus. In December 2014, Gallagher paid Hopp and Anthony a $254,956 advance on the bonus, leaving a balance of $89,184. Both Anthony and

---

[177] Tr. at 868:1-5 (Caraher testimony).

Hopp were each paid $43,705 less than the December 2013 compensation change provided for. Anthony and Hopp agreed to have $86,000 of the $89,000 balance given to their staff. Thus, as reconciled in early 2015, Gallagher owed Anthony and Hopp a $3,184 balance, $1,592 each.

But Gallagher's October 2015 unilateral contract modification retroactively changed the 2014 compensation that had already been paid and reconciled. In October 2015, Gallagher claimed Anthony and Hopp each *owed* Gallagher $40,308 for a claimed 2014 overpayment.

Anthony argues that the October 2015 change also retroactively changed his 2015 compensation. After nearly ten months of work had been performed, Gallagher changed the 2015 pay formula. Gallagher used this changed formula to pay Anthony $125,879 less than the 2011 Addendum required and $102,553 less than the compensation owed after the December 2013 compensation changes.[178] Gallagher disputes this 2015 total but admits it owes Anthony $87,500 for 2015 salary and bonus.[179]

The Court now applies the Restatement of Contracts, Section 241 factors.

Factor one supports a finding that Gallagher materially breached its obligation to pay Anthony, giving support for excusing Anthony from his non-solicit and non-service obligations. Anthony and Gallagher had agreed upon a salary formula. That agreement required signed approval for any change to the formula. Thus, Anthony could reasonably rely upon the agreement.

---

[178] Tr. 752.
[179] Doc. 42 ¶ 29; Doc. 91 at 50.

Factor two, however, favors Gallagher. Anthony's injury is large but purely economic. Anthony may be adequately compensated in the counterclaim for such injuries.

The third factor requires the court to examine the extent to which the breaching party—here Gallagher—will suffer forfeiture if Anthony's performance of the non-solicitation and non-service is excused. Here, Gallagher has entered into an employment agreement to protect it from open competition for certain customers. This Court has found that Anthony did not solicit his former customers and performed as he was expected to under the contract. Thus, there was no nonperformance, and Gallagher suffers no forfeiture.

As for the likelihood that Gallagher would cure the failure, Gallagher has already stated that it owes Anthony at least some part of his 2015 commissions and bonuses. It says it had not yet paid only because it was waiting to see if this litigation would allow it to offset the amount against damages. Thus, Gallagher's breach by failing to pay owed salary is curable. This breach is not material.

Because Gallagher's breach of its obligation to pay Anthony the salary it agreed to can be remedied with a cash award to Anthony, the Court finds Gallagher's breach of contract weighs against excusing Anthony's compliance with the non-solicitation agreement. But again, this Court has found that Anthony did in fact comply with the non-solicitation agreement.

### III.     Counterclaim

Counterclaim Plaintiff Anthony counterclaims against Gallagher for unpaid compensation from 2014 and 2015. Gallagher stipulates that there is an unpaid amount of at least

$87,500 for Anthony's 2015 salary and bonus.[180] Anthony argues that he is owed $95,000 in unpaid 2014 salary and $116,112 in unpaid 2015 salary, totaling $211,112.38.[181]

In support of his counterclaim, Anthony cites the various changes to his Employment Agreement and Addendum between 2010 and 2015 as evidence of breach.[182] Under the 2010 Employment Agreement and the 2011 Addendum, Anthony and Hopp each received 20.2125% of revenues. However, in December 2013, Gallagher gave notice of a 2014 compensation change. Counterclaim Plaintiff Anthony argues that he should receive compensation according to the Employment Agreement and the Addendum. Those give Anthony roughly 20.2125% of their revenues. Responding, Gallagher claims the Employment Agreement and Addendum compensation was changed by the December 2013 changes to the 2014 compensation.

## A. Original Commission-Based Compensation

Counterclaim Plaintiff Anthony argues that Gallagher did not have the power to unilaterally change his compensation, and that a mutual agreement was required to alter his compensation.[183] Compensation under the original compensation plan would apply as follows:

| Year | Revenue | Commission | Owed | Paid | Unpaid |
|------|---------|-----------|------|------|--------|
| 2014 | $5,318,000[184] | 20.2125% | $1,074,900 | $1,077,493 | $-2,593 (Overpaid) |
| 2015 | $5,335,653[185] | 20.2125% | $954,337 | $831,108 | $123,229 |

---

[180] Doc. 42 ¶ 29; Doc. 91 at 50.
[181] Tr. 6:34; Tr. 921:21-23.
[182] *See supra* at 40-43.
[183] Tr. 7:41.
[184] Tr. 747.
[185] *Id.*

### B.  2014 Salary Adjustment

Counterclaim Defendant Gallagher validly argues that Anthony was in an at-will employment contract[186] and that Gallagher could prospectively unilaterally change the terms of Anthony's employment.[187] Anthony received notification of his compensation alteration and remained employed with Gallagher. By continuing his employment after receiving notice of the salary change, Anthony agreed to the new compensation arrangement.[188] Thus, the 2014 Salary Adjustment controls Anthony's compensation for 2014 and 2015. [189]

Under the 2014 Salary Adjustment, Anthony was to be paid a $950,000 salary, one-half of thirty percent of new business, one-half of twenty percent of net revenue, and a future years' salary adjustment.[190]

| Year | Salary | ½ 30% New Business | ½ 20% Net Revenue | Future Year's Adjustment | Owed | Paid | Unpaid |
|------|--------|-------------------|-------------------|-------------------------|------|------|--------|
| 2014 | $950,000[191] | | | | $1,121,098[192] | $1,077,493[193] | $43,605 |
| 2015 | $1,045,000[194] | | | | $933,661[195] | $831,108[196] | $102,553[197] |

---

[186] Generally, contracts with an indefinite term are "at-will" employment contracts. *Bartlett v. Daniel Drake Mem. Hosp.*, 599 N.E.2d 403, 405 (Ohio Ct. App. 1991); *Paglia v. Heinbaugh*, No. 93-T-4838, 1994 WL 110892, at *3 (Ohio Ct. App. Feb. 25, 1994).

[187] *Nichols v. Waterfield Financial Corp.*, 577 N.E.2d 422 (Ohio Ct. App. 1989) (holding that employer could prospectively change terms and conditions of at-will employment contract, without consideration other than continued employment); *Pate v. Quick Sols., Inc.*, 2011-Ohio-3925, ¶ 23, 2011 WL 3449619, at *4 (Ohio Ct. App. Aug. 9, 2011).

[188] Email communications were also presented indicating that Anthony assented to the 2014 Compensation adjustment. Pl. Exs. 110; 111.

[189] *Id.*

[190] Tr. 750; Tr. 848.

[191] Tr. 750.

[192] Tr. 751.

[193] *Id.*

[194] *Id.*

[195] Tr. 752. Adjusted to account for Anthony's early departure from Gallagher.

[196] *Id.*

[197] Doc. 89 at 7.

Gallagher owes Anthony $43,605 in 2014 compensation and $102,553 in 2015 compensation for a total of $146,158.

### C.  Violation of Ohio Rev. Code § 4113.15

Ohio Rev. Code § 4113.15 requires that all "wages earned" during the first 15 days of a month must be paid by the 1st of the following month, and all "wages earned" during the remainder of the month must be paid by the 15th of the following month.[198] Gallagher admits that it owes Anthony $87,500. This Court, however, finds that Gallagher owes Anthony $146,158 for 2014 and 2015.

Anthony's employment ended on November 20, 2015, and the $146,158 in unpaid wages has remained unpaid after the "thirty days beyond the regularly scheduled payday."[199] Because there was no dispute as to the $146,158 in unpaid wages owed, Anthony is entitled to the six percent interest rate provided for in Ohio. Rev. Code. §4113.15(B).

### IV.    Conclusion

For the reasons above, this Court **DENIES** Gallagher's breach of contract, tortious interference, and misappropriation claims and **GRANTS** Anthony's counterclaim only as to breach of contract for $146,158.

IT IS SO ORDERED.

Dated:  August 30, 2016                              *s/        James S. Gwin*
                                                     JAMES S. GWIN
                                                     UNITED STATES DISTRICT JUDGE

---

[198] O.R.C. §4113.15(A).
[199] O. R.C. §4113.15(B).